# EXHIBIT A

# Sotheby's

1334 York Avenue<br>
New York, New York 10021<br>
+1 212 606 7000 SOTHEBYS.COM

## CONSIGNMENT AGREEMENT

October 12, 2022<br>
Consignment Number: 40336999<br>
Account Number: 52807827

**PART A**

Chapter 7 Estate of Artemus USA LLC
PO Box 549 919 N. Market Street Suite 460
Wilmington, DE 19899-0549 USA

This consignment agreement, which includes Parts A, B and C, sets out the terms on which you consign the Property listed on the Property Schedule in Part B to us for sale. References in this agreement to numbered Conditions are to the Conditions of Business for Sellers set out in Part C. Condition 1 contains the definitions of capitalized terms not defined in this Part A.

**THE SALE:** We shall offer the Property for sale in the sale(s) set out in the Property Schedule, on the terms of this agreement. Our current pre-sale estimates are set out in the Property Schedule, subject to Condition 3. We will designate the Property when we market it with a mutually agreed designation. For Property sold at auction, you authorize us to charge the Buyer and to retain for our own account the Buyer's Premium and Overhead Premium as set out in Condition 1 and Condition 12(a), plus any applicable VAT, unless otherwise stated in this Part A.

**THE PROPERTY:** You shall deliver the Property to us or make it available for us to collect, unless it is already in our custody or control.

**SELLER'S COMMISSION:** We will not charge you any Seller's Commission on the Property.

**BUYER'S PREMIUM SHARE:** As set out under "Settlement" below, we will pay you a portion of the Buyer's Premium we receive in cleared funds (a "**Buyer's Premium Share**") equal to 3.0% of the Hammer Price for Property sold.

**SALE COSTS:** Sale Costs will apply and will be shared between you and us as set out in the Sale Costs Schedule in Part B of this agreement, plus any applicable VAT.

**LOSS OR DAMAGE:** We will assume liability, at no cost to you, for loss or damage to the Property on the terms set out in Condition 7.

**RECONSIGNMENT:** Any Property designated on the Property Schedule as for sale at a different selling location will be offered for sale by our affiliated Sotheby's Group Company in the location listed on the Property Schedule, and any such sale will be subject to all taxes, charges and settlement terms applicable to the sale at the relevant sale location, as set out in Condition 22.

**VAT:** We will reconsign any lot of Property designated on the Property Schedule for sale in London so that it shall be offered for sale at public auction by our affiliate in London, Sotheby's ("**Sotheby's London**"). You acknowledge that the Property has been or will be imported from outside the United Kingdom for sale in London

# Sotheby's

and that Sotheby's London will be selling the Property under its Temporary Admission arrangement. Sotheby's London will charge the Buyer UK Import VAT at the prevailing rate on the Hammer Price and UK domestic VAT at the standard rate on the Buyer's Premium and Overhead Premium for the Property. You acknowledge that any applicable Artist's Resale Right royalty due on the sale of the Property will be charged to the Buyer.

**SETTLEMENT:** We will pay you the Net Sale Proceeds on the relevant Settlement Date (as defined below), subject to Condition 13. For Property sold at auction, the **"Net Sale Proceeds"** are the amount remaining from the Hammer Price we receive in cleared funds after deducting the Seller's Commission (if any), Sale Costs payable by you (if any) and any applicable VAT and taxe forfaitaire, *plus* your Buyer's Premium Share. The **"Settlement Date"** will be the date that is the later of (i) 45 days after the last session or closing date (as applicable) of the relevant sale in which the Property is offered, and (ii) five business days after our receipt of the Purchase Price in full and in cleared funds. If any Settlement Date falls on a Saturday, Sunday or public holiday, settlement will be on the next business day.

**BANKRUPTCY ACTION:** On April 1, 2022, Artemus USA LLC (the **"Debtor"**) filed a voluntary petition for relief under Chapter 7 of title 11 of U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) styled In re Artemus USA LLC. (Case No. 22-10281 (JKS). Jeoffrey L. Burtch was duly appointed and is serving as the trustee for the Debtor's chapter 7 estate.

**EFFECTIVE DATE:** This agreement shall for all purposes become in full force and in effect on the business day following the date that an order approving this agreement is entered by the Bankruptcy Court and becomes a final non-appealable order.

In addition to the foregoing and the information set out in Part B, you agree to the Conditions of Business for Sellers in Part C, as amended by Parts A and B if applicable (and in the event of a conflict, Parts A and B will prevail). Further, in connection with a sale, the Conditions of Business for Buyers, which will be available on our website (www.sothebys.com) in advance of the sale and as amended by any announcement or posted notices, are the terms and conditions for the Buyer and bidders. The Conditions of Business for Buyers and your express representations and warranties and indemnity given in this agreement, together, are the entire agreement between us, you and the Buyer.

*[Signature page(s) to follow]*

# Sotheby's

By signing below, you confirm you have read and accept, and agree to the sale of the Property in accordance with, the terms of this agreement and the Conditions of Business for Buyers.

**Sotheby's, Inc.**

By _Mari-Claudia Jiménez_ Date _11/03/2022_

Name _Mari-Claudia Jiménez_ Title Chairman, Managing Director Worldwide Head Business Development Global Fine Arts, Sotheby's

**ACCEPTED AND AGREED:**

**Chapter 7 Estate of Artemus USA LLC, owner**

Signed _Jeffrey L. Burtch, Trustee_ Date _11/3/22_

Name Jeffrey L. Burtch                Title Trustee

3

# Sotheby's

**PART B**

**SCHEDULE I – PROPERTY SCHEDULE**

**Item CD4QJ – Frank Stella, La Scienza della Fiacca, 1984**

| | |
|---|---|
| Low - High Estimates | $280,000 – $350,000 |
| Reserve / Status | ███████████ |
| Department | Contemporary Art |
| Sale | CURATED SEPT 2023 NEW YORK LIVE |
| Sale Location | New York |

**Item CD4QM – Frank Stella, Blyvoors, 1982**

| | |
|---|---|
| Low - High Estimates | $200,000 – $300,000 |
| Reserve / Status | ███████████ |
| Department | Contemporary Art |
| Sale | CURATED MARCH 2023 NEW YORK LIVE |
| Sale Location | New York |

**Item CD4QN – Jules Olitski, Ashtoreth Implied-3, 1978, acrylic on canvas**

| | |
|---|---|
| Low - High Estimates | $20,000 – $30,000 |
| Reserve / Status | ███████████ |
| Department | Contemporary Art |
| Sale | CURATED MARCH 2023 NEW YORK LIVE |
| Sale Location | New York |

4

# Sotheby's

**Item CD4QR – Frank Stella, Guifa E La Bettetta Rossa**

| | |
|---|---|
| Low - High Estimates | $250,000 – $350,000 |
| Reserve / Status | ███ |
| Department | Contemporary Art |
| Sale | CTP DAY LDN MARCH 2023 LIVE |
| Sale Location | London |
| Country of Export | United States |
| VAT symbol | Dagger |

**Item CD4QS – Nabil Nahas, Equinox I, 2000**

| | |
|---|---|
| Low - High Estimates | $30,000 – $40,000 |
| Reserve / Status | ███ |
| Department | 20 Cen Middle Ea Art |
| Sale | N11141 DEC CTP DISCO NY ONLINE |
| Sale Location | London |
| Country of Export | United States |

5

# Sotheby's

**PART B**

**SCHEDULE II – SALE COSTS SCHEDULE**

We will absorb the Sale Costs for (a), (d), (e), (j), and will charge you the Sale Costs for (b), (c), (f), (g), (h), (i), if applicable:

(a) a fee for catalogue illustration, production and distribution (if applicable as set out in the Property Schedule);

(b) costs for packing, shipping, and any applicable customs duties, taxes or tariffs for shipping the Property to our sale location or warehouse;

(c) costs for our travel to inspect and/or prepare the Property for transport;

(d) costs of any agreed-upon marketing and advertising;

(e) costs of reproduction rights;

(f) authentication costs, including any related packing, shipping and customs duties;

(g) costs of framing, cleaning and restoration, approved by you, and any related packing, shipping and customs duties;

(h) costs of other services approved by you, including those performed by others and any related packing, shipping and customs duties;

(i) costs for packing, shipping and any applicable customs duties for shipping the Property back to you (to where it was located at the time of consignment or as otherwise mutually agreed), if unsold; and

(j) a fee for property handling and administration and our assumption of liability.

**Sotheby's**

*[Page intentionally blank]*

# Sotheby's

## PART C

## CONDITIONS OF BUSINESS FOR SELLERS

### 1. Defined Terms

In this agreement, "we", "us" and "our" refers to Sotheby's, Inc. and "you" and "your" refer to the individual, corporation or other entity whose name appears at the top of Part A. If there is more than one consignor, "you" and "your" refer to all consignors; if the consignor is an agent acting on behalf of a principal, "you" and "your" refer to both principal and agent.

If there is more than one consignor consigning the Property under this agreement, each consignor, including any co-owner, jointly and severally assumes the consignor's obligations and liabilities under this agreement. If you are an agent acting on behalf of a principal, you and your principal are bound by the terms of this agreement and jointly and severally assume all obligations, liabilities, representations, warranties and indemnities set out in this agreement.

The following capitalized words will have the specific meaning shown here:

**Authenticity Guarantee:** the guarantee we provide as principal to the Buyer in relation to a purchased lot, as set out in the Conditions of Business for Buyers. In relation to a sale, where applicable, any reference by us to the "Terms of Guarantee" should be understood to mean the Authenticity Guarantee.

**Buyer:** the buyer of record of an item of Property.

**Buyer's Premium:** for auction items, the premium the Buyer must pay. The Buyer's Premium rate, which is a percentage of the Hammer Price, is set out in the Conditions of Business for Buyers. As of the date of this agreement, the Buyer's Premium is 25% of the Hammer Price up to and including $1,000,000, 20% of any Hammer Price in excess of $1,000,000 up to and including $4,500,000, and 13.9% of any Hammer Price in excess of $4,500,000. Buyer's Premium is subject to any applicable VAT.

**Buy-Now Marketplace:** our online marketplace operated and available through our online platform.

**Conditions of Business for Buyers:** for auction items, the terms and conditions for the Buyer and bidders that are applicable to the sale in which the Property will be offered, which will be set out on our website in advance of the sale in which the Property is scheduled to be offered, and as amended by any announcement or posted notices. In relation to a sale, where applicable, any reference by us to "Conditions of Sale" should be understood to mean the Conditions of Business for Buyers.

**Hammer Price:** for auction items sold, the last price accepted for the item by the auctioneer or acknowledged by our online platform. The Hammer Price is subject to any applicable VAT.

**Listing Period:** for buy-now items, the time period for which we will list the Property on our sale platform. The Listing Period commences when the listing becomes live on the platform and ends on the earlier of when the Property is sold or the expiration of the period.

**Listing Price:** for buy-now items, the asking price for the Property, which includes the initial Listing Price and any reduced Listing Price during the Listing Period.

**NFT:** a non-fungible token established on a blockchain. Where the Property includes more than one NFT, references to "NFT" in this agreement will mean with respect to each NFT.

**Overhead Premium:** for auction items, the fee the Buyer must pay as an allocation of overhead costs relating to our facilities and other administrative expenses. The Overhead Premium rate, which is a percentage of the Hammer Price, is set out in the Conditions of Business for Buyers. As of the date of this agreement, the Overhead Premium rate is 1% of the Hammer Price. Overhead Premium is subject to any applicable VAT.

**Property:** an item of property consigned by you under this agreement and listed in the Property Schedule in Part B. Where more than one item of property is consigned, references to "Property" in this agreement will mean with respect to each item of Property. For NFTs, the "Property" means both the NFT and the Referenced Content.

**Purchase Price:** for auction items, the Hammer Price plus the Buyer's Premium, Overhead Premium, any applicable VAT and/or sales or use tax, and any applicable artist resale right royalty payable by the Buyer on qualifying Property. For buy-now items, the final price we collect from the Buyer, including any applicable VAT and/or sales or use tax, and any applicable artist resale right royalty payable by the Buyer on qualifying Property.

**Referenced Content:** the metadata, content, digital asset and/or physical item, if any, associated with an NFT.

**Reserve:** for auction items, the confidential minimum price agreed with you at which the Property can be sold. Where more than one item of property is consigned, references to "Reserve" in this agreement will mean with respect to each item of Property.

**Sale Costs:** the costs related to this consignment, plus any applicable VAT.

**Seller's Commission:** for auction items, the amount we will charge you as a commission, which we will retain for our account. Seller's Commission is subject to any applicable VAT.

**Sotheby's, Inc.:** the company incorporated in New York, with its headquarters at 1334 York Avenue, New York, NY 10021, USA.

**Sotheby's Group:** the Delaware corporation Sotheby's, Sotheby's Financial Services, Inc., and any entities in which either of them hold, from time to time, directly or indirectly, more than 50% of the issued share capital; and each, a "Sotheby's Group Company."

**Sotheby's Metaverse:** our online marketplace for NFTs (also referred to in this agreement as "our Metaverse").

**VAT:** for Property sold in a location in which a Value Added Tax regime applies, any applicable Value Added Tax or an amount in lieu of Value Added Tax, as the case may be, at the prevailing rate.

### 2. Consignment

(a) You retain us as your exclusive agent to offer the Property for sale on the terms set out in this agreement. While we are your exclusive agent, you may not offer or attempt to offer the Property for sale other than pursuant to the terms of this agreement.

(b) For this consignment, we will determine (i) the cataloguing and other descriptions of the Property, (ii) the grouping of items of Property in each lot or parcel (a group of lots of the same type and quantity of wine), (iii) the date(s) and location(s) of the sale(s), (iv) the marketing and promotion of the Property, unless specifically agreed with us in writing, (v) the manner of conducting the sale(s) (including setting the starting bid), and (vi) whether Property will be offered for sale as a "premium lot," which may require additional information from prospective bidders as set out in the Conditions of Business for Buyers. We may (though we have no duty to), before and after the sale(s), consult an expert or experts and conduct due diligence and research in relation to the Property or its provenance.

(c) If we have not inspected the Property in person prior to execution of this agreement, we may modify or cancel this agreement upon our in-person inspection of the Property if it is not satisfactory to us; *provided* that we complete such inspection within thirty (30) days of receipt of the Property.

(d) For consignments of wine or spirits, upon our receipt of the Property, we may alter or remove entirely the capsule of the Property to inspect the cork condition and any markings. We will notify you in writing if we decline to accept the consignment of any item because it has no sale value, and the Property Schedule will be deemed not to include such item(s). After 30 days from such notice, we will return the no-sale-value item(s) to you at your expense, unless you instruct us in writing otherwise. We will not be responsible for loss or damage to any such items that occurs more than three business days after our notice to you.

(e) We may from time to time decide to change the sale or platform in which we will offer the Property for sale (including but not limited to from a live auction to a timed auction or to our Buy-Now Marketplace or Metaverse). In any such case, we will notify you of the new sale and/or sale platform and provide the details and terms relevant to the new sale and/or platform. Unless you object in writing by the earlier of (i) seven days of our notice to you, or (ii) one day prior to the start of the relevant sale, the Property Schedule will be deemed amended, we will offer the Property in the new sale and/or on the new platform, and the sale of the Property will be subject to the Conditions of Business for Buyers applicable to the relevant sale or platform.

### 3. Estimates and Reserves

(a) Any oral or written pre-sale estimates or Listing Price(s) are our non-binding opinion only. Estimates and Listing Prices are not to be relied upon as a prediction of the selling price or value of the Property. We may revise estimates from time to time prior to the sale in our sole discretion.

(c) Property offered without a Reserve will be identified as such on the Property Schedule, and in the online listing and sale catalogue or in a salesroom announcement. You acknowledge that any Property that will be offered for sale without a Reserve might sell for a price much lower than its low estimate.

(d) We will not be liable if bidding does not reach the Reserve. In any such case, however, we may sell Property at a price below the Reserve provided we pay you the Net Sale Proceeds you would have been entitled to receive had the Property sold at the Reserve.

### 4. Consignor Bidding

(a) You may not bid on the Property or permit any other person to do so on your behalf (other than to the extent we may bid on your behalf up to but not including the Reserve. If you do so, we may (i) regard you as the Buyer, but without the benefit of the Authenticity Guarantee, (ii)

8

# Sotheby's

disregard and cancel any of your bids and/or (iii) pursue other remedies, including reselling the Property without a Reserve and/or charging you the Seller's Commission, Sale Costs, Buyer's Premium, Overhead Premium and any applicable artist resale right royalty payable by the Buyer on qualifying Property.

## 5. Representations and Warranties

You represent and warrant to us and to each Buyer that at all relevant times (including at the time of consignment and at the time of sale of the Property):

(a) you have sole, complete and lawful right, title and interest in the Property; or, if you are acting as an agent, your principal has sole, complete and lawful right, title and interest in the Property, and you are properly authorized by your principal to sell the Property on these terms;

(b) there are no claims or potential claims, legal proceedings, liens, security interests, encumbrances or other restrictions on or regarding the Property, except for the action regarding that item of Property that is Frank Stella, *Blyvoors* (the "**Blyvoors Work**") that is pending in the Supreme Court of the State of New York, County of New York (Index No. 656115/2017) (the "**Action**"), and you have no knowledge of any facts or circumstances that might give rise to any claims in connection with the Property. In the event the Action is not resolved as of two (2) business days prior to the date of the auction for the Blyvoors Work, Sotheby's may withdraw the Blyvoors Work subject to Condition 9;

(c) good and marketable title to and right to possession of the Property will pass to the Buyer free from any third-party rights, liens, security interests, claims or potential claims, restrictions or encumbrances;

(d) you have fully disclosed to us all information (including documents) known to you or in your possession that might affect the sale or value of the Property, including but not limited to information concerning the Property's condition (including any damage or restoration), provenance, ownership, authenticity, attribution, authorship, origin, date, age, period, culture, source, and export or import history, and the existence of any endangered or protected species in the Property, as applicable, and you shall continue to disclose any such information that becomes known to you up to and including the date on which the Property is sold;

(e) if the Property has been imported into the country in which it is located, it was lawfully imported, required declarations were made, any duties and taxes were paid, and it was lawfully and permanently exported from the country or jurisdiction in which it had been located;

(f) you have notified us in writing of any taxes and/or duties that are payable by us on your behalf in any country other than the country of the applicable sale location;

(g) any images and descriptions of the Property and Referenced Content, if applicable, you provide to us do not infringe any third-party rights; and unless you advise us in writing to the contrary at the time of consignment, you are not aware of any restrictions on our right to reproduce or use photographs, images or videos of the Property produced by us to the extent permitted by applicable law;

(h) unless you advise us in writing to the contrary at the time of consignment, any electrical or mechanical goods or components are in a safe operating condition if reasonably used for the purpose for which they were designed, and are free from any defect not obvious on external inspection which could prove dangerous to human life or health;

(i) your performance under this agreement has not and will not violate any applicable law, regulation or code in any jurisdiction;

(j) if the Property is or includes an NFT, (i) minting of the NFT and/or creation of the Referenced Content, if applicable, the sale of the NFT as contemplated by this agreement, and the transfer of the NFT will not (1) breach any agreements you have entered into with any third parties, (2) violate any applicable law, regulation or code in any jurisdiction, or (3) infringe any third-party rights, including any intellectual property rights, and (ii) you have no knowledge or reason to believe that you or your agent will be unable to transfer the NFT;

(k) your consignment of the Property for sale does not facilitate tax crimes;

(l) you have no knowledge or reason to suspect that (i) the Property is connected with the proceeds of criminal activity, or (ii) you, or any co-owner(s) or principal(s) (or, if you are an entity, any person(s) or entity(ies) with a beneficial or ownership interest in you), are under investigation, charged with, or convicted of any substantive or predicate money laundering or economic sanctions crime, terrorist activity, tax evasion or act in violation of any applicable anti-bribery or anti-corruption law;

(m) you (and your principal, if applicable) are not, nor are you or your principal (if applicable) owned, controlled, or acting on behalf of, an entity or individual that is: (i) the subject of economic sanctions, embargoes or other trade restrictions in any jurisdiction, including those administered and enforced by the United States, European Union, United Kingdom, United Nations Security Council, or other applicable sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized, or resident in a country or territory that is the subject of Sanctions (including Crimea, Cuba, Iran, North Korea, Syria, Russian Federation and Belarus) (collectively, "**Sanctioned Jurisdictions**"); and you will not transfer the Net Sale Proceeds to, or use them for the benefit of, anyone that is the subject of Sanctions or located, organized, or resident in a Sanctioned Jurisdiction;

(n) if you are acting as agent on behalf of a principal, you have disclosed to us the identity of your principal and have taken steps reasonably designed to ensure compliance with Sanctions, anti-money laundering, anti-terrorism, and anti-bribery or anti-corruption laws, including but not limited to, conducting appropriate due diligence on your principal, and all commissions payable to you for this consignment have been authorized by your principal; and

(o) you have full legal authority without any further action or other party's consent to enter into and perform this agreement and to give these representations and warranties; if you are an entity, the individual signing on your behalf is authorized to do so and the entity is duly incorporated or formed, validly existing and in good standing in the jurisdiction where it is incorporated or formed.

## 6. Indemnity

You shall indemnify and hold us, each Sotheby's Group Company, our and their respective officers and employees, and the Buyer harmless against any and all claims, causes of action, liabilities, damages, losses, and expenses (including but not limited to reasonable attorneys' fees), arising out of or in connection with an inaccuracy, incompleteness or breach of any of your representations or warranties or breach of your obligations under this agreement.

## 7. Our Loss or Damage Liability

(a) If any Property will be in our custody or control, this Condition 7 will apply with regard to such Property. Subject to Condition 7(b) and unless otherwise agreed with us in writing in accordance with Condition 8, we assume liability for loss or damage to the Property, commencing from when we or our designated agent receive the Property and ceasing (i) for sold Property, when risk passes to the Buyer following its sale; (ii) for unsold Property, on the earlier of 60 days after the sale in which it was offered or when the Property is released to you; or (iii) six months after our receipt of the Property if it is not consigned for sale.

(b) We will not be liable for any loss or damage (i) occurring during any process undertaken by independent contractors engaged with your consent, including but not limited to for restoration, conservation, framing, mounting or cleaning; (ii) caused to frames or to glass covering prints, paintings or other flat works; (iii) caused by changes in humidity or temperature (as long as we take reasonable care in handling the Property), normal wear and tear, gradual deterioration or inherent vice or defect (including woodworm), war, any act or acts of terrorism (as defined by our insurers), nuclear fission, radioactive contamination, or chemical, bio-chemical or electromagnetic weapons; or (iv) for wine or spirits, occurring in the course of altering or removing the capsule to inspect cork condition and any markings.

(c) If any loss or damage occurs to the Property during the period identified in Condition 7(a), we will determine the extent of depreciation to the Property, if any, caused by the loss or damage, and our liability to compensate you in respect of that loss will be limited to the Property Value, less the Seller's Commission and Sale Costs payable by you, if any. For the purposes of Condition 7, the "**Property Value**" will mean the amount equal to: (i) for sold Property, the Hammer Price, (ii) for unsold Property, the Reserve, or (iii) for Property not yet offered for sale, the mid-estimate.

(d) If, in our reasonable opinion, the loss or damage to the Property results in a depreciation of the Property of less than 50%, we will pay you the amount of depreciation and offer the Property for sale or, at your request, return it to you, subject to Condition 16. If, in our reasonable opinion, the loss or damage to the Property results in a depreciation of the Property of 50% or more, we will pay you the Property Value, less the Seller's Commission and Sale Costs payable by you, if any, and all title, interest and rights to the Property will pass to us.

(e) If you disagree with our opinion as to the depreciation of the Property, we will solicit an appraisal from an independent expert recognized in the relevant field whose selection you approve, such approval not to be unreasonably withheld. You and we agree that such appraisal will be the final determination.

(f) Upon your receipt of payment from us in accordance with this Condition 7, you, on your own behalf and on behalf of your insurer(s), irrevocably release us from all liability for loss or damage to such Property and irrevocably waive all rights and claims that you might have against us in connection with the same.

## 8. Seller's Loss or Damage Liability

(a) If you do not wish for us to assume liability for loss or damage to the Property that will be in our custody or control as set out in Condition 7 above, you and we must agree to do so in Part A of this agreement or otherwise in writing. In any such case, you shall maintain insurance cover for the Property until the Buyer has paid for it in full. You also agree to: (i) provide us with a certificate of

9

# Sotheby's

insurance for the Property and a waiver of subrogation by your insurer of all rights and claims that you might have against us, each in a form satisfactory to us; (ii) indemnify and hold us harmless against all claims, causes of action, losses and liabilities, including reasonable attorneys' fees, arising from loss or damage to the Property; (iii) notify your insurer of the terms of the indemnity set out in (ii) above; and (iv) irrevocably waive all rights and claims that you might have against us, each Sotheby's Group Company, our and their respective officers and employees, and our agents or warehouses in connection with or arising out of such loss or damage, except where the loss or damage was caused by our gross negligence or willful misconduct. If you fail to comply with this Condition 8(a) within ten days of our receipt of the Property, we will assume liability for loss or damage to the Property in accordance with Condition 7 from the following day, but our liability will be limited to the excess (if any) of (A) the amount set out in Condition 7(c) over (B) any amount payable to you under your own insurance plus any applicable deductible.

(b)  For Property that is or includes an NFT, you will store or cause to be stored the NFT and Referenced Content in a manner that, to the best of your knowledge, cannot be reasonably expected to restrict in any manner your ability to transfer the NFT nor the Buyer's ability to receive, access or display the NFT and Referenced Content. Further, you will make reasonable commercial efforts to maintain the status of the NFT until such time as we direct you to transfer the same (or until any post-auction sale period or other agreed time for us to offer the Property as your agent expires as contemplated by this agreement), and without limiting the foregoing, you will not intentionally delete, dispose of, transfer, move, modify, interfere with or otherwise change in any way the NFT or Referenced Content, as applicable, prior to the transfer of the NFT. Until the NFT is received in the Buyer's or our digital wallet, as applicable, you agree to assume all risks in relation to the Property and irrevocably waive all rights and claims that you might have against us, each Sotheby's Group Company, our and their respective officers and employees, and our agents or warehouses in connection with or arising out of any loss or damage to the NFT, except where the loss or damage was caused by our gross negligence or willful misconduct. In addition, you will immediately notify us in writing of any loss or damage to the NFT while it is in your custody or control.

9.  Withdrawal
(a)  We may, in our sole discretion, withdraw any Property from sale if we reasonably determine there are serious grounds for concern (i) as to the Property's authenticity or attribution, or that (ii) any of your representations or warranties are inaccurate, incomplete or breached, (iii) you have materially breached any other provision of this agreement, (iv) the Property suffers loss or damage and is not in the condition in which it was when we agreed to offer it for sale, (v) the Property requires but lacks the appropriate Convention on International Trade in Endangered Species license or exemption, or (vi) the sale has subjected or might subject us or you to liability or material damage to our reputation or brand.
(b)  If you withdraw any Property from sale after you sign this agreement, you agree to pay the Withdrawal Fee, as defined in Condition 9(c). You may not, however, withdraw any Property from sale once the Reserve for the Property has been met.
(c)  The "Withdrawal Fee" is the sum of the Seller's Commission as set out in Part A, Buyer's Premium (less the Buyer's Premium Share) and Overhead Premium, each at the rates current when the Property was consigned and in each case calculated as if the withdrawn Property had sold at the mid-estimate, plus any Sale Costs we incurred prior to the withdrawal of the Property. You agree that the Withdrawal Fee is a reasonable estimate of the harm to us that would result from withdrawal of the Property.
(d)  If Property is withdrawn pursuant to Condition 5(b), 9(a)(ii), 9(a)(iii) or 9(b), we will charge you the Withdrawal Fee. If Property is withdrawn pursuant to Condition 9(a)(v) or 9(a)(vi), we may charge you the Withdrawal Fee if you failed to disclose to us prior to the sale facts or circumstances material to our determination. We will not charge you the Withdrawal Fee if Property is withdrawn pursuant to Condition 9(a)(i) or 9(a)(iv).
(e)  In any case where you owe us the Withdrawal Fee, you shall promptly pay us upon our request to you, and following our receipt of the Withdrawal Fee (unless otherwise agreed with you), we will withdraw the Property from sale and, if applicable, return it to you at your expense, subject to Condition 16. We will determine the timing and content of any announcement regarding any withdrawal of Property, provided that such announcement will not disparage you.

10.  Post-Auction Sales
If the Property fails to sell at auction, you authorize us to sell it in a post-auction sale during the period of 40 days following the auction, for a price that will result in payment to you of an amount of no less than the Net Sale Proceeds that would have been due to you had the Property sold at the Reserve at auction or for a price agreed by you and us in writing. In such event, your obligations to us are the same as if such Property had sold at auction, and any reference in these Conditions or in the Conditions of Business for Buyers to the date of the sale will be deemed to be the date of the post-auction sale.

11.  Unsold Property
(a)  If the Property remains unsold after the period for post-auction sales set out in Condition 10 or the expiration of the Listing Period, as applicable, we will notify you. In such case, we may agree with you that the unsold Property will be offered for sale again or you may collect it, if applicable.
(b)  For unsold Property in our custody or control, if within 45 days of the sale we do not agree to reoffer the Property for sale and you neither collect it nor instruct us to arrange return shipment at your cost and risk, we may (i) return it to you at your cost and risk, (ii) sell it through Sotheby's or elsewhere, with estimates and reserves at our discretion (including without reserve), (iii) store it at your risk and expense, for which we will charge you our standard storage fees applicable at the relevant time and place and published on our website, or (iv) store it at a third-party warehouse, at your risk and expense.
(c)  If we decide to offer the Property for sale pursuant to Condition 11(b)(ii), we will be entitled to sell such Property after 30 days' notice to you. If the Property sells, we will be entitled to deduct from the sale proceeds the Seller's Commission and Sale Costs payable by you in accordance with Part A and Part B, if any, and any other costs we incur in selling the Property, and any excess will be remitted to you. Any such sale conducted by a Sotheby's Group Company will be conducted under the Conditions of Business for Buyers applicable to the relevant sale.

12.  Payment from the Buyer
(a)  For Property sold in an auction, you authorize us to charge the Buyer and to retain for our own account the Buyer's Premium and Overhead Premium.
(b)  For Property sold, title to the Property will transfer to the Buyer upon our receipt of the Purchase Price in full and in cleared funds from the Buyer.
(c)  We have no obligation to enforce payment by the Buyer. We will use commercially reasonable endeavors to collect payment from the Buyer, but we will not be required to commence legal proceedings. If we charge the Buyer interest for late payment, you authorize us to retain such interest for our own account. We will take reasonable steps to inform you of any action being taken against the Buyer and consider your views.
(d)  If we pay you any portion of the Net Sale Proceeds for which we have not collected payment from the Buyer, simultaneously with such payment, you hereby assign to us all rights you might have against such Buyer to the extent of such payment.
(e)  If the Buyer fails to pay the Purchase Price in full and in cleared funds when due, we may, in our sole discretion, take and enforce any of the remedies set out in the Conditions of Business for Buyers, including cancelling the sale and returning the Property to you, if applicable. Alternatively, if we agree to remit to you an amount equal to the Net Sale Proceeds, ownership of the Property will pass to us, and we will have the benefit of your representations and warranties and indemnity in this agreement and of the Authenticity Guarantee.
(f)  If you take any action against the Buyer to enforce payment of the amount due to you, you will take reasonable steps to keep us informed. If you recover any funds from the Buyer, you agree to remit to us from such funds our share of the sale proceeds remaining, if any, after you first recover your costs (including reasonable attorneys' fees) incurred in collecting from the Buyer and the Net Sale Proceeds that were due to you.

13.  Payment to You
(a)  Payment will be made only to you in accordance with the payment instructions you have provided in Exhibit A or that you will provide in the form of Exhibit A, as the case may be, provided that (i) you have satisfied our Know Your Client requirements, (ii) we are not aware of any circumstances that might give rise to rescission pursuant to Condition 15, (iii) if applicable, the Buyer has not exercised the Consumer Cancellation Right as set out in Condition 14, and (iv) if applicable, you have provided the required information under Condition 18. Further, with respect to any Property sold in the United Kingdom, the European Union or Switzerland, in circumstances where the Consumer Cancellation Right applies, settlement of the Net Sale Proceeds will be on the later of the Settlement Date or upon the expiration of the Consumer Cancellation Period as defined in Condition 14(a). If you request payment in a currency other than the currency of the sale, we will convert the Net Sale Proceeds into the currency of your choice (but not including cryptocurrencies) based on the exchange rate quoted by a financial entity designated by us on the date on which we pay you.
(b)  If payment will be made to you in cryptocurrency, you represent and warrant the following: (i) you own the digital wallet used to receive payment; (ii) the digital wallet or account is not directly or indirectly hosted, operated, or otherwise controlled by anyone that is the subject of Sanctions or located, resident, or organized in a Sanctioned Jurisdiction. You agree to provide

10

# Sotheby's

documentation reasonably requested to confirm that you own the wallet used to receive payment.
(c) If we do not receive your signed payment instructions in the form attached as Exhibit A, we will use the payment instructions we receive from you either in a mutually agreed upon manner or in a customary form of communication between you and us. You irrevocably release us from and waive all claims that you might have against us for any loss or damage you sustain due to our reliance upon your payment instructions, except where the loss or damage was caused by our gross negligence or willful misconduct.
(d) If we have custody of the Property and release it to the Buyer before our receipt of the Purchase Price in full, we will pay you the Net Sale Proceeds, regardless of whether we have collected payment in full from the Buyer, as follows: (i) if no extended payment terms have been granted to the Buyer, on the later of 45 days after the sale or within five business days of our release of the Property, or (ii) if extended payment terms have been granted to the Buyer, the portion of the Net Sale Proceeds corresponding to each payment installment will be paid on the later of the relevant installment payment date or within five business days of our release of the Property.

### 14. Consumer Cancellation
(a) If a Buyer in a timed auction or any other distance sale is a "consumer" (namely a Buyer acting for purposes that are wholly or mainly outside the Buyer's trade, business, craft or profession) who habitually resides in the European Union or United Kingdom (a "**Consumer**") and you are or, where you are acting as agent, the owner of the Property is, a "trader" (namely someone acting for purposes relating to their trade, business, craft or profession, whether acting personally or through another person acting in the trader's name or on the trader's behalf (a "**Trader**")), then the Buyer has the right to cancel the online purchase of goods (the "**Consumer Cancellation Right**") during the period of 14 calendar days after the Buyer or their designated agent (other than the carrier) acquires physical possession of the Property (the "**Consumer Cancellation Period**").
(b) If the Buyer exercises the Consumer Cancellation Right, we will notify you and cancel the sale of the Property. Within ten days of your receipt of our written notice to you, you shall return to us any Net Sale Proceeds we paid to you for such Property plus all costs (including reasonable attorney's fees and standard delivery charges, if applicable) we incur in connection with cancelling the sale and enforcing this provision. Upon our receipt of such payment, we will return such Property to you at your expense, subject to Condition 16, unless we are not able to return the Property due to reasons beyond our control.

### 15. Rescission
We may, in our sole discretion, rescind the sale of the Property if we reasonably determine there are serious grounds for concern that (a) the Guarantee Line or "Authorship" is incorrect, or the Property is a "counterfeit" (in each case as defined in the relevant Authenticity Guarantee provided to the Buyer), or in the case of a book or manuscript, the text or illustration is materially defective, (b) any of your representations or warranties are inaccurate, incomplete or breached, (c) any of the Buyer's representations or warranties are inaccurate, incomplete or breached, or (d) the sale has subjected or might subject us or you to liability. In any such case, we will provide you, as reasonably in advance of our determination as circumstances permit, with the basis for our proposed determination (unless we are restricted from doing so on legal or regulatory grounds) and will give

due consideration to any matters you wish to raise. Within ten days of your receipt of our written notice to you of a rescission having occurred, you shall return to us the Net Sale Proceeds we paid to you for such Property plus all costs, including reasonable attorney's fees, we incur in connection with rescinding the sale and enforcing this provision. Upon our receipt of such payment, we will return such Property to you at your expense, subject to Condition 16, unless we are not able to return the Property due to reasons beyond our control.

### 16. Retention and Use of Property and Proceeds
(a) We may keep any Property and any other items belonging to you that are under the custody or control of any Sotheby's Group Company (i) until you have paid all amounts you owe any Sotheby's Group Company; and (ii) for a reasonable period in the event of an unresolved issue whereby the release of the Property might subject us to liability. If you owe any amount pursuant to this agreement that remains unpaid for more than 15 days after we notify you, we may charge you and retain for our account interest on such amount at an annual rate of six percentage points (6%) above the prime rate, but in no event greater than the maximum rate permitted by law.
(b) In addition, if you owe any amount to any Sotheby's Group Company or have breached or defaulted on any obligation owed to any Sotheby's Group Company, you authorize us to (i) use the Net Sale Proceeds against any amounts you owe to any Sotheby's Group Company and to pay any amount remaining to you; (ii) hold the Net Sale Proceeds pending resolution of any claim of breach or default we have against you; and/or (iii) use or deal with any of your property held by any Sotheby's Group Company in any way permitted by law (including the Property to which this agreement relates), including by selling it in any way we think appropriate, at a reserve that we determine and without a reserve, notwithstanding Condition 3 above. If we sell such property, we will use the Net Sale Proceeds against any amounts you owe us and pay any remainder to you. If there is a shortfall, you shall pay us any difference between the amount we have received from the sale and the amount you owe us. If unsold, we will release such property to you, subject to Condition 16(a) above, only after we are paid in full for what you owe or any claim against you is resolved.

### 17. Photographs and Illustrations
(a) Subject to any rights of third parties and any exclusions provided by applicable law, we may use and retain any images, descriptions and other content regarding the Property and Referenced Content, if applicable, provided by you.
(b) We own the exclusive copyright to all images and written material we produce relating to the Property and Referenced Content, if applicable. You cannot use them without our prior written permission. We may use them as we deem appropriate, to the extent permitted by law, before or after the sale of Property, and we will be solely liable for any losses or damages arising out of our use of such images and material.

### 18. Taxes
(a) You acknowledge you are solely responsible for paying, and you will pay, all taxes and/or duties due on all amounts due to you under this agreement. If we withhold tax pursuant to this Condition, such amount will be deducted from the Net Sale Proceeds.
(b) You authorize us to collect any taxes, duties, VAT or any other applicable tax on your behalf, where required by law.
(c) If we are required to pay any taxes, duties, VAT or any other applicable tax on your behalf to a tax authority in any

country (including outside the sale location), you authorize us to withhold such amounts from the Net Sale Proceeds. If we have already remitted the Net Sale Proceeds, you shall reimburse us for any such amounts we pay, to the extent permissible by law.
(d) Where we are required by law to report to tax authorities in any jurisdiction any amount related to this sale, you authorize us to make such reporting.
(e) You must provide to us the appropriate information (e.g., information requested on a Form W-9 or equivalent if you are a "U.S. Person," as defined below, or, where applicable, a Form W-8BEN/BEN-E or equivalent if you are a "non-U.S. Person," as defined below) required to legally obtain a reduction to or elimination of tax we may otherwise be required to withhold. A "**U.S. Person**" is a United States citizen or resident, or an entity, including an estate or trust, formed under the laws of the United States. A "**non-U.S. Person**" is anyone who is not a U.S. Person. If you have previously provided the required information to a Sotheby's Group Company and it remains valid as of the date of this agreement with respect to payments hereunder, you authorize such company to release the information to us. If, prior to us remitting a payment to you or on your behalf pursuant to this agreement, any such form or information that you previously provided expires or becomes obsolete or inaccurate in any respect, you will promptly notify us and provide us with updated and valid information.
(f) Failure to provide the appropriate information or to update obsolete information will result in us having to delay payment due to you pursuant to this agreement until such information is provided. If this information is not provided within 30 business days of the Settlement Date or if we are otherwise required to do so by law, we will withhold U.S. tax from the amounts due to you for immediate remittance to the U.S. Internal Revenue Service (the "**IRS**").
(g) If you (i) are a U.S. Person or fail to provide the required information as set out in paragraph (e) above, and (ii) have sold property for US$600 (or the equivalent in local currency of the selling location or in cryptocurrency) or more in a calendar year, we must report such amount to the IRS (and possibly to U.S. state(s)). If we have made such reporting, we will give you a copy of what we filed.
(h) You acknowledge that no one within Sotheby's Group has provided tax advice to you or for your benefit in connection with this agreement.

### 19. Limitation of Liability
(a) You acknowledge that attribution of the Property is a matter of opinion only and not a statement of fact, and is dependent upon, among other things: information you provide to us, the condition of the Property, the degree of research, examination or testing that is possible or practical in the circumstances, and the status of generally accepted expert opinion, research and scientific or technical analysis at the time of cataloguing. You acknowledge we have no duty to include in any description of the Property a reference to any specific third-party attribution nor to the possibility of other views or potential attribution, whether positive or negative.
(b) We make no guarantees, representations or warranties to you with respect to the Property, its authenticity, attribution, authorship, origin, date, age, period, culture, source, legal title, condition, value, anticipated selling price or otherwise.
(c) We will not be liable for any acts or omissions by us in connection with the preparation for or conduct of the auction or sale of the Property. We will not be liable for

11

# Sotheby's

errors or omissions in the catalogue or other descriptions of the Property, though if we discover a material error or omission in such materials prior to the sale, we will provide a correction, time permitting.
(d) We will not be liable to you for any errors or failure to execute bids placed by bidders through our online platform, including, without limitation, errors or failures caused by (i) any loss of connection between bidders and our online platform; (ii) a breakdown or problem with our online platform or other technical services; or (iii) a breakdown or problem with a bidder's internet connection, computer, mobile device or system.
(e) Without prejudice to Conditions 19(a)-(d), our liability to you under this agreement will not exceed the amount of the Net Sale Proceeds for the relevant Property, except in the case of our willful misconduct, gross negligence or fraud, or death or personal injury caused by our negligent acts or omissions.
(f) Neither you nor we will be liable for any special, consequential, indirect, or incidental damages.

## 20. Force Majeure

(a) We will not be liable for or be deemed to have defaulted under or breached this agreement for failure, except with respect to payment obligations, or delay in fulfilling or performing any of our obligations to the extent, and for so long as, such failure or delay is caused by events beyond our reasonable control, including without limitation, fire, flood, natural disaster or other event caused by forces of nature, riot, strike or other civil or labor unrest, transportation or other infrastructural incapacitation, inability to secure sufficient labor, power or necessary equipment, act of war, armed conflict, terrorist attack, governmental action or regulation, outbreak of disease, public health emergency, epidemic, nuclear or chemical contamination, or any other cause that we could not have prevented with reasonable care (any of the foregoing, a "Force Majeure Event").
(b) If a Force Majeure Event impedes or interferes with our ability to hold a sale or to perform our obligations relating to the sale of the Property, we may modify the sale or our obligations relating to the sale of the Property in various ways, including, without limitation: (1) postponing or canceling a sale, (2) changing the location of a sale, (3) changing the platform for or format of a sale (including but not limited to from live to timed auction or from our Metaverse to our auction platform), (4) rescheduling the sale of the Property to a different sale, and/or (5) modifying or canceling any planned marketing of the Property. In such circumstances, we shall promptly notify you. If the Property will be offered in a different sale than originally scheduled, the sale of the Property will be subject to the Conditions of Business for Buyers applicable to the sale in which the Property will then be offered.

## 21. Confidentiality and Data Protection

(a) Neither you nor we may disclose the terms of this agreement to any third party without the prior written consent of the other party, except (i) to attorneys, insurers, contractors, agents, advisors or financial participants on a need-to-know basis and provided they are subject to confidentiality obligations that are no less restrictive than this provision, or (ii) to comply with valid legal process or regulatory authority compelling the disclosure, provided, where permitted to do so by law, the disclosing party first gives the other party prompt written notice of such service of process and allows the other party an opportunity to seek a protective order.
(b) We will hold and process your personal information and may share it with another Sotheby's Group Company for use as described in, and in line with, our Privacy Policy published on our website at https://www.sothebys.com/en/privacy-policy or available on request by email to enquiries@sothebys.com.

## 22. Reconsignment

(a) Any Property designated on the Property Schedule as for sale at a different selling location will be offered for sale by our affiliated Sotheby's Group Company with offices in the location listed on the Property Schedule. With respect to such Property only, we assign our rights and obligations under this agreement to the relevant Sotheby's Group Company, and you hereby consent to such assignment.
(b) We may from time to time decide Property should be offered for sale by another Sotheby's Group Company at a different selling location, and if we do so, we will notify you. In any such case, we will assign our rights and obligations under this agreement with respect to the reconsigned Property only to the relevant Sotheby's Group Company, unless you object in writing within 14 days of our notice of reconsignment.
(c) The following will apply with respect to the reconsigned Property only: (i) the Net Sale Proceeds for such Property will be remitted in the currency in which the sale is conducted, and all local charges and taxes will apply, (ii) references to the Conditions of Business for Buyers will mean those applicable to the relevant sale, (iii) the sale of the Property will be subject to the laws of the jurisdiction of the relevant sale, (iv) references to "we", "us" and "our" will be deemed to mean the Sotheby's Group Company that will offer the Property for sale under this agreement, and (v) these Conditions of Business for Sellers will continue to apply as between you and us and will prevail in the event of any conflict. In addition, with respect to any Property reconsigned to the United Kingdom, the European Union or Switzerland, settlement of the Net Sale Proceeds will be on the later of the Settlement Date or upon the expiration of the Consumer Cancellation Period.

## 23. Miscellaneous

(a) You will provide to us, upon our request, verification of identity and any additional information required to comply with our Know Your Client requirements or applicable law or to evidence your authority to sign this agreement. If you are acting as agent on behalf of a principal, you will disclose to us the identity of your principal. If you do not satisfy these requirements, we may cancel this agreement. In addition, if you are an agent acting on behalf of a principal, you will retain and make available upon request the documentation evidencing your due diligence on your principal for at least five years or for such other period as required under applicable law.
(b) This agreement is intended to create a consignment of the Property. You have consigned the Property to us as bailee and to enable us to perform our obligations as your agent, during the period of this consignment, for the sale of the Property.
(c) This agreement, including Parts A, B and C, constitutes the entire agreement between us and you with respect to this consignment and supersedes all prior or contemporaneous written, oral or implied understandings, representations or agreements relating to the subject matter of this agreement. If any part of this agreement is deemed invalid or unenforceable, such invalidity or unenforceability will not affect the remaining provisions of this agreement, which will remain in full force and effect. No provision of this agreement may be amended unless you and we agree in writing (including by email) to do so.
(d) This agreement will remain in force in the event of your death and is binding upon, and inures to the benefit of, you, your estate, heirs, executors, devisees, representatives, administrators, successors and permitted assigns.
(e) You may not assign your rights or delegate your obligations under this agreement without our prior written consent.
(f) You may not grant a security over the Property or do anything that might result in a lien, claim or encumbrance on the Property from the date on which you execute this agreement unless and until the Property is released to you in accordance with the terms of this agreement.
(g) If we receive a subpoena or an order from a court, body or authority of competent jurisdiction relating to the Property, the agreement, or to you or your principal, you agree to pay us the costs we incur, including reasonable attorney's fees, in responding to the subpoena or complying with the relevant order.
(h) You have had the opportunity to consult an attorney of your choosing before signing this agreement, and you acknowledge we have not provided legal advice to you or for your benefit in connection with this agreement.
(i) To the extent otherwise applicable, the Vienna Convention on the International Sale of Goods is excluded.
(j) The provisions in this agreement that by their nature are intended to survive termination or the completion of the transactions contemplated (including, by way of illustration only, those relating to returning the Property, liability and indemnity, confidentiality, choice of law and dispute resolution) will so survive.
(k) This agreement may be executed in counterparts, each of which will be deemed an original and together constitute one instrument. Signatures sent by facsimile or email transmission or other electronic signatures are valid and binding and will be deemed an original.

## 24. Law and Jurisdiction

This agreement will be governed by and construed in accordance with the laws of the State of New York. In the event of a dispute arising from or relating to this agreement, you and we agree to submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware.

Sotheby's

13

# Sotheby's

## EXHIBIT A

## PAYMENT INSTRUCTIONS

**Please confirm and complete your payment details below and return to us within 14 days of receipt.**

Consignor Name: Chapter 7 Estate of Artemus USA LLC

Address: PO Box 549 919 N. Market Street Suite 460

Wilmington, DE 19899-0549 USA

Client Account Number:                                       Consignment Number: 40336999

If you require payment by wire transfer in respect to future settlements for the above account, please complete your bank details below. We will deduct a fixed fee of $30 per consignment for such payments.

Payee/Account Name:

Bank Name:

Bank Address:

Account Number:

Intermediary Bank Name:

Intermediary Bank Address:

Sort or Swift Code/ABA Number/BIC Number                    IBAN Number (if applicable)

Client Signature:                                            Dated:

Please note that if we do not receive these signed completed instructions, payments will be remitted by check to the above-referenced address. Payments cannot be remitted in cash or in Malaysian Ringgit, New Taiwan Dollars, Korean Won and Renminbi / Chinese Yuan.

If we have agreed in our written agreement with you to remit payments in cryptocurrency in respect to future settlements for the above account, please provide your wallet details below.

Payee/Account Name

Bitcoin wallet address:

Ether Coin wallet address:

USD Coin wallet address:

Client Signature                                             Dated

Please note that if we do not receive these signed completed instructions with your cryptocurrency wallet details, payment in cryptocurrency will not be remitted and we may hold you accountable for any resulting charges or fees we incur.

**The Payee/Account Name must match the Consignor Name.**

**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| ARTEMUS USA LLC, | : | Case No. 22-10281 (JKS) |
| | : | |
| Debtor. | : | |

**DECLARATION OF DISINTERESTEDNESS OF
MARI-CLAUDIA JIMÉNEZ, ON BEHALF OF SOTHEBY'S, INC.**

I, Mari-Claudia Jiménez, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am Chairman, Managing Director, Worldwide head of Business Development Global Fine Arts of Sotheby's, Inc. I am submitting this Declaration in support of the Trustee's Motion for Authorization of the Retention of Sotheby's, Inc. as Auctioneer and (ii) Approving Consignment Agreement and Sale of Assets Pursuant Thereto (the "Motion"). Sotheby's intends to provide the services set forth in the Motion and the Consignment Agreement (as defined in the Motion).

2. On or about November 3, 2022, Sotheby's and the Trustee entered into the Consignment Agreement, pursuant to which Sotheby's agreed to assist the Trustee with the marketing and sale of certain Artwork of the Estate. The Trustee agreed to pay Sotheby's a fee based on the Hammer Price of the Artwork at the conclusion of the sale, as further described in the Consignment Agreement. Sotheby's is not owed any amounts from the Estate as of the date of this Declaration.

3. Sotheby's is a "disinterested person" within the meaning of 11 U.S.C. § 101(14). Sotheby's has no business, professional or other connection with the Trustee, the Debtor, or their attorneys, and does not represent, nor will it represent, any interest adverse to the Estate in the matter in which it is to be engaged.

4. Sotheby's is not connected with the Trustee, the Debtor, any creditor, or other party in interest, their respective attorneys and accountants.

5. Sotheby's is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code in that to the best of my knowledge, Sotheby's, its members and employees:

    a. Are not creditors, equity security holders, or insiders of the Estate;

    b. Are not and were not, within two years before the date of the filing of the Debtor's bankruptcy petition, a director, officer, or employee of the Debtor; and

    c. Do not have an interest materially adverse to the interests of the Estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

6. Sotheby's reserves the right to file a supplemental declaration with this Court in the event that Sotheby's becomes aware of any connections contrary to the statements contained herein.

7. The scope of the services to be performed by Sotheby's, the terms of its retention, and the fee structure are accurately set forth in the Consignment Agreement.

8. Sotheby's has not agreed to share with any person except its members and consultants the compensation to be paid for the services rendered in this case.

_____
(Declarant)

2